Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Bradley K. King (SBN 274399)
*bking@ahdootwolfson.com*
Christopher E. Stiner (SBN 276033)
*cstiner@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: (310) 474-9111
Fax: (310) 474-8585

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESE JIMENEZ, individually, on behalf of her minor child M.F., and on behalf of all others similarly situated, | Case No. 5:20-cv-02591 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| ZOOM VIDEO COMMUNICATIONS, INC., a Delaware corporation, | DEMAND FOR JURY TRIAL |
| Defendant. | |

Plaintiff Therese Jimenez, on behalf of herself, her minor child M.F., and all others similarly situated, alleges the following against Defendant Zoom Video Communications, Inc. ("Defendant" or "Zoom") based upon personal knowledge with respect to herself and her minor child M.F., and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## BRIEF SUMMARY OF THE CASE

1. In early 2020, usage of video conferencing increased dramatically in response to the coronavirus pandemic. Defendant Zoom Video Communications, Inc. ("Defendant" or "Zoom") is one of the preeminent suppliers of video conferencing services both prior to and during this period. Zoom's products and services can be used across mobile devices, desktops, telephones, and room systems.

2. During the coronavirus pandemic Zoom's usage surged. As of the end of December 2019, the maximum number of daily meeting participants, both free and paid, conducted on Zoom was approximately 10 million. In March 2020, Zoom reached more than 200 million daily meeting participants, both free and paid.[1] With the surge in usage also came increased scrutiny on Zoom's privacy policies.[2]

3. On March 26, 2020, an article was published revealing that, unbeknownst to users, the Zoom iPhone app was sending users' personal data to Facebook even if users didn't have a Facebook account.[3]

4. In response, on March 27, 2020, Zoom published a statement from its Founder and Chief Executive Officer, Eric Yuan, admitting that the Zoom iPhone app had been sending users' personal data to Facebook, and that Zoom was unaware of this data transfer

---

[1] Eric S. Yuan, *A Message to Our Users* (April 1, 2020), https://blog.zoom.us/wordpress/2020/04/01/a-message-to-our-users/

[2] BBC News, *Zoom under increased scrutiny as popularity soars* (April 1, 2020), https://www.bbc.com/news/business-52115434.

[3] Joseph Cox, *Zoom iOS App Sends Data to Facebook Even if You Don't Have a Facebook Account* (March 26, 2020), https://www.vice.com/en_us/article/k7e599/zoom-ios-app-sends-data-to-facebook-even-if-you-dont-have-a-facebook-account

until two days prior. Nevertheless, Zoom maintained that it "takes its users' privacy extremely seriously" and that its "customers' privacy is incredibly important to" Zoom.[4]

5.     On March 29, 2020, Zoom broadly revised its privacy policy claiming it was only an update. Zoom's pre-March 29, 2020 privacy policy stated plainly that "Whether you have Zoom account or not, we may collect Personal Data from or about you when you use or otherwise interact with our Products." Zoom's post-March 29, 2020 privacy policy provides a more complicated explanation which, in essence, explains the same thing: regardless of whether you have opened an account or not we are collecting your personal data.[5] Users who entered a Zoom meeting without opening an account would never even encounter this privacy policy. This data should have received the most rigorous protection available – it did not.

6.     For instance, the Zoom iPhone app provided Facebook the user's device information such as the model, the time zone and city they are connecting from, which phone carrier they are using, and a unique advertiser identifier created by the user's device that companies can use to target a user with advertisements.[6]

7.     Subsequent to this security breach, an even more troubling phenomenon began, commonly referred to as "Zoombombing," during which unauthorized participants enter Zoom meetings to disrupt them with offensive behavior such as posting racial slurs

---

[4] Eric S. Yuan, *Zoom's Use of Facebook's SDK in iOS Client* (March 27, 2020), https://blog.zoom.us/wordpress/2020/03/27/zoom-use-of-facebook-sdk-in-ios-client/

[5] "We obtain data when you use Zoom in order to deliver our services and provide a better experience to you. The categories of data we obtain when you use Zoom include data you provide to us as well as data that our system collects from you. When we say "customer", we mean the person or company that signs up for and has the account with Zoom. A "host" is someone who can host meetings under a customer account. "You" or "user" or "participant" is anyone who uses Zoom. ("You" and "user" may also include customers. Some of the information below applies only to customers, though, and we use "customer" to highlight those places.)"

Zoom Privacy Policy (March 29, 2010), https://zoom.us/privacy?zcid=1231

[6] Joseph Cox, *Zoom iOS App Sends Data to Facebook Even if You Don't Have a Facebook Account* (March 26, 2020), https://www.vice.com/en_us/article/k7e599/zoom-ios-app-sends-data-to-facebook-even-if-you-dont-have-a-facebook-account

and other derogatory statements.[7] Significantly, many schools have closed and moved their classes online using Zoom's video conferencing service to connect students and teachers. In one disturbing instance in the Berkley Unified School District a man joined a class meeting on Zoom, exposed himself to students, and shouted obscenities.[8] This led the Berkley Unified School District to suspend use of Zoom.

8.     Even though Defendant was storing sensitive personal data and providing secure video conferencing connections for both account holders and non-account holders, Defendant failed to take security precautions necessary to protect that data and those conferences. Because Defendant failed to take necessary security precautions, or properly review the functioning of its video conferencing technology, users' personal data was released to third parties, including Facebook, and secure video conferences were compromised. Certain of these users never even opened an account with Zoom, and would have no idea that Zoom was collecting their personal data or its security policy.

9.     On April 1, 2020, Zoom's Founder and CEO issued a statement admitting to certain of these failings stating "we recognize that we have fallen short of our community's—and our own—privacy and security expectations."[9]

## **PARTIES**

10.     Plaintiff M.F. is, and at all times relevant was, a citizen of the State of California residing in Culver City, California. Beginning in March 2020, Plaintiff M.F.'s school was closed to in person attendance and classes were moved online. Plaintiff M.F. attended classes through Zoom video conferencing services. Plaintiff M.F. is, and at all relevant times was, under the age of 13.

---

[7] Kristen Taketa, *San Diego Zoombombing' incident highlights need for schools to use safety controls* (April 8, 2020), https://www.sandiegouniontribune.com/news/education/story/2020-04-08/san-diego-zoombombing-incident-highlights-need-for-schools-to-use-safety-controls

[8] Kate Finman, *Berkeley school district temporarily suspends use of video conferencing after man 'Zoom bombs' class meeting* (April 8, 2020), https://www.dailycal.org/2020/04/08/berkeley-school-district-suspends-teleconferenced-classes-after-man-zoom-bombs-instruction/

[9] Eric S. Yuan, *A Message to Our Users* (April 1, 2020), https://blog.zoom.us/wordpress/2020/04/01/a-message-to-our-users/

---

11.     Plaintiff Therese Jimenez ("Plaintiff Jimenez" and, collectively with Plaintiff M.F., "Plaintiffs") is, and at all times relevant was, a citizen of the State of California residing in Culver City, California. Plaintiff Jimenez is the mother and natural guardian of Plaintiff M.F. On or about March 9, 2020, Plaintiff Jimenez was provided a link and password to a Zoom meeting and attended the meeting without downloading the Zoom software. Prior to her attendance at the March 9, 2020 Zoom meeting, she was not provided Zoom's Privacy Policy, or any other information regarding Zoom's privacy and security practices and policies.

12.     Defendant Zoom Video Communications, Inc. is a Delaware corporation with its principal place of business and headquarters in San Jose, California.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000 (exclusive of interests and costs), because there are more than 100 members in each of the proposed classes, and because at least one member of each of the proposed classes is a citizen of a State different from Defendant.

14.     This Court has personal jurisdiction over Defendant because it is headquartered in California, and regularly conducts business in California.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in, was directed to, and/or emanated from this District.

## STATEMENT OF FACTS

### Zoom and Its Services

16.     Zoom provides a cloud-based communications platform for video and audio conferencing to both business and individual consumers throughout California and the United States. Zoom's products and services can be used across mobile devices, desktops, telephones, and room systems.

17. Zoom purports to provide a "video for every need" to "enable internal and external communications, all-hands meetings, and trainings through one communications platform."[10]

18. Since its founding Zoom boasted that its platform has been used to conduct tens of billions of meeting minutes.[11]

19. Zoom has developed mobile apps to access its most popular service, Zoom meetings, for both the iPhone and Android. Zoom provides software to access Zoom meetings on a desktop for both the Windows and Mac operating systems. Further add-ons, add-ins, plugins and extensions are available for Microsoft Office 360, Outlook, Gmail, Firefox, Chrome and Safari.

20. Parties who host a Zoom meeting invite participants by either having Zoom link to the host's email account directly where it provides a form email containing the URL for participants of the Zoom meeting to click on, or by otherwise providing that URL for participants to enter into their web browser.

21. Alternatively, Zoom provides a telephone number and access code for participants who wish to call with a telephone as a voice only participant.

22. Users who have a Zoom app on their computer or cellphone are directed to that app after clicking on the URL. User who do not have the Zoom app are directed to a Zoom webpage where the meeting is hosted. Voice only telephone users participate in the meeting as one would with a normal telephone conference call, i.e. without employing any app or webpage.

23. In early 2020, usage of video conferencing increased dramatically in response to the coronavirus pandemic, and Zoom's usage surged. As of the end of December 2019, the maximum number of daily meeting participants, both free and paid, conducted on Zoom

---

[10] *See* https://zoom.us/meetings

[11] Zoom Video Communications, Inc. Form S-1 (March 22, 2019),
https://www.sec.gov/Archives/edgar/data/1585521/000119312519083351/d642624ds1.htm

was approximately 10 million. In March 2020, Zoom reached more than 200 million daily meeting participants, both free and paid.[12]

## **Zoom Privacy Policy**

24.     Zoom maintains what it describes as "marketing" websites, e.g. zoom.us and zoom.com, where its Privacy Policy is available.

25.     Prior to March 29, 2020, Zoom's Privacy Policy stated:

**Collection of your Personal Data**

Whether you have Zoom account or not, we may collect Personal Data from or about you when you use or otherwise interact with our Products. We may gather the following categories of Personal Data about you:

- Information commonly used to identify you, such as your name, user name, physical address, email address, phone numbers, and other similar identifiers
- Information about your job, such as your title and employer
- Credit/debit card or other payment information
- Facebook profile information (when you use Facebook to log-in to our Products or to create an account for our Products)
- General information about your product and service preferences
- Information about your device, network, and internet connection, such as your IP address(es), MAC address, other device ID (UDID), device type, operating system type and version, and client version
- Information about your usage of or other interaction with our Products ("Usage Information")
- Other information you upload, provide, or create while using the service ("Customer Content"), as further detailed in the "Customer Content" section below[13]

26.     Zoom's pre-March 29, 2020 Privacy Policy continues "Mostly, we gather Personal Data directly from you, directly from your devices, or directly from someone who communicates with you using Zoom services, such as a meeting host, participant, or caller.

---

[12] Eric S. Yuan, *A Message to Our Users* (April 1, 2020), https://blog.zoom.us/wordpress/2020/04/01/a-message-to-our-users/

[13] Zoom Privacy Policy (February 23, 2020) accessed via the Internet Archive Wayback Machine, https://web.archive.org/web/20200311205042/https://zoom.us/privacy?zcid=1231

Some of our collection happens on an automated basis – that is, it's automatically collected when you interact with our Products."[14]

27.     Finally, Zoom's pre-March 29, 2020 Privacy Policy states "We may also obtain information about you from a user who uses Zoom."[15]

28.     On March 26, 2020, Joseph Cox posted an article on Vice Media Group's website revealing that the Zoom iPhone app sends data to Facebook even if you don't have a Facebook account.[16] The article states "The Zoom app notifies Facebook when the user opens the app, details on the user's device such as the model, the time zone and city they are connecting from, which phone carrier they are using, and a unique advertiser identifier created by the user's device which companies can use to target a user with advertisements." The article continues that Zoom confirmed the data collection several days after it was asked for comment and a day after the publication of the article.

29.     On March 27, 2020, Zoom's Founder and Chief Executive Officer, Eric Yuan, published a statement asserting that Zoom was unaware until two days prior that its Zoom iPhone app was providing any of its users' personal data to Facebook. Nevertheless, Mr. Yuan represented that Zoom "takes its users' privacy extremely seriously" and that its "customers' privacy is incredibly important to us." [17]

30.     Mr. Yuan further confirmed that users' personal data  released to Facebook included: Application Bundle Identifier; Application Instance ID; Application Version; Device Carrier; iOS Advertiser ID; iOS Device CPU Cores; iOS Device Disk Space Available; iOS Device Disk Space Remaining; iOS Device Display Dimensions; iOS Device

---

[14] *Id.*

[15] *Id.*

[16] Joseph Cox, *Zoom iOS App Sends Data to Facebook Even if You Don't Have a Facebook Account* (March 26, 2020), https://www.vice.com/en_us/article/k7e599/zoom-ios-app-sends-data-to-facebook-even-if-you-dont-have-a-facebook-account

[17] Eric S. Yuan, *Zoom's Use of Facebook's SDK in iOS Client* (March 27, 2020), https://blog.zoom.us/wordpress/2020/03/27/zoom-use-of-facebook-sdk-in-ios-client/

Model; iOS Language; iOS Timezone; iOS Version; and IP Address.[18] An updated version of the Zoom app was released which would prevent the release of information to Facebook. Users were encouraged, but not required, to update to this newer version of the Zoom app.

31.     On March 29, 2020, Zoom's Chief Legal Officer, Aparna Bawa, released a statement that "We are not changing any of our practices. We are updating our privacy policy to be more clear, explicit, and transparent."[19] This statement links to a broadly revised Zoom Privacy Policy that includes both more and less clarity.

32.     Gone is the prior representation that "Whether you have Zoom account or not, we may collect Personal Data from or about you when you use or otherwise interact with our Products." Now Zoom's revised Privacy Policy states:

> We obtain data when you use Zoom in order to deliver our services and provide a better experience to you.  The categories of data we obtain when you use Zoom include data you provide to us as well as data that our system collects from you. When we say "customer", we mean the person or company that signs up for and has the account with Zoom.  A "host" is someone who can host meetings under a customer account. "You" or "user" or "participant" is anyone who uses Zoom. ("You" and "user" may also include customers. Some of the information below applies only to customers, though, and we use "customer" to highlight those places.)[20]

33.     The import of this revised statement is that, despite revisions, Zoom's policy remains that it collects personal data on any "user" or "participant" regardless of whether or not that user or participant has a Zoom account.

34.     This personal data includes, but is not limited to: information that identifies you (name, username and email address, or phone number); technical information about your devices, network, and internet connection (IP address, MAC address, other device ID (UDID), device type, operating system type and version, client version, type of camera,

---

[18] *Id.*

[19] Aparna Bawa, Zoom's Privacy Policy (March 29, 2020),
https://blog.zoom.us/wordpress/2020/03/29/zoom-privacy-policy/

[20] Zoom Privacy Policy (March 29, 2010), https://zoom.us/privacy?zcid=1231

microphone or speakers, connection type); approximate location; and other forms of metadata.[21]

35.   Zoom's revised Privacy Policy further states "We do not allow marketing companies, advertisers or similar companies to access personal data in exchange for payment. We do not allow third parties to use any personal data obtained from us for their own purposes, unless you consent (e.g., when you download an app from the Marketplace)."[22]

36.   Zoom's revised Privacy Policy continues that "Zoom is committed to protecting your personal data. We use a combination of industry-standard security technologies, procedures, and organizational controls and measures to protect your data from unauthorized access, use, or disclosure."[23]

37.   Finally, Zoom's revised Privacy Policy includes the following procedures to control the use and dissemination of personal data "Because of CCPA's broad definition, as is the case with many providers since the CCPA became law, we provide a 'Do Not Sell My Personal Information' link at the bottom of our marketing sites. You can use this link to change your Cookie Preferences and opt out of the use of these advertising tools. If you opt out, Personal Data that was used by these tools will no longer be shared with third parties in a way that constitutes a 'sale' under CCPA."[24]

38.   Plaintiffs are informed and believe that Zoom has not complied with its own Privacy Policy by, among other things, sharing personal data from people engaging with its products to third parties, including but not limited to Facebook.

39.   Zoom users who have not been notified by the March 27, 2020, statement, and have thus not updated to the newer version of the Zoom iPhone app, continue to have their information released to Facebook.

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

40.     Furthermore, Zoom's disclosure of its Privacy Policy—and its collection and dissemination to third-parties of users' personal data—is only available through a small link on Zoom's marketing page. Zoom users who opened an account prior to March 29, 2020, would not have encountered the updated Privacy Policy by simply opening the Zoom app on their desktop or mobile device. Zoom users who have not opened a Zoom account have never been provided the Zoom Privacy Policy, nor is it likely they have ever even seen the Zoom marketing page since they are automatically placed in a Zoom meeting after clicking the provided URL.

41.     While Zoom continues to represent that it "takes its users' privacy extremely seriously" and that its "customers' privacy is incredibly important to" it, Zoom's actions demonstrate otherwise. Zoom has attempted to sidestep liability by offering an update to its Zoom iPhone app through a blog post on its website without affirmatively contacting current users, and by revising its Privacy Policy to further obscure that users without accounts are having their data collected by Zoom and shared with third-parties.

42.     Had Zoom informed its accountholders that it would not engage in a thorough review of who its Zoom iPhone app was sharing personal data with, e.g. Facebook, it is likely that  method of verifying what information was provided third-parties, customers—like Plaintiffs and Class members—would not have been willing to purchase its services at the price charged, or even to have used it regardless of price.

43.     Zoom's failure to implement adequate security protocols or app review procedures jeopardized millions of consumers' privacy, fell well short of its promises, and diminished the value of the products and services provided. In other words, because Defendant failed to disclose its gross security inadequacies, and affirmatively shared users' information with third parties without their informed consent, it delivered fundamentally

less useful and less valuable products and services than those for which consumers like Plaintiffs paid, and/or expected when they chose to use them.[25]

44.     While Zoom's wrongful conduct constitutes invasion of privacy in and of itself, entitling consumers to damages, Plaintiffs and Class members are also now placed at an increased risk of further imminent harm as a direct result of Zoom's wrongful acts and omissions.

## **"Zoombombing"**

45.     Further failures of Zoom's security procedures have arisen with a troubling phenomenon referred to as "Zoombombing." Zoombombing involves unauthorized participants entering Zoom meetings to disrupt them with offensive behavior such as posting racial slurs and other derogatory statements.  Significantly, many schools have closed and moved their classes online using Zoom's video conferencing service to connect students and teachers.

46.     Therefore, just as schools, businesses, support groups and millions of individuals have adopted Zoom as a meeting platform in an increasingly remote world, reports of Zoombombing by uninvited participants have become frequent.[26]

47.     On April 3, 2020, the New York Times reported that "While those incidents may have initially been regarded as pranks or trolling, they have since risen to the level of hate speech and harassment, and even commanded the attention of the F.B.I."[27]

48.     An analysis by The New York Times found "153 Instagram accounts, dozens of Twitter accounts and private chats, and several active message boards on Reddit and

---

[25] Zoom has admitted to further security issues related to its products including: "Zoombombing"— incidents of harassment by unauthorized participants in a Zoom meeting; failure of Zoom to implement promised end-to-end encryption; privacy issues related to attendee tracking features; data disclosures to LinkedIn; etc.

Eric S. Yuan, *A Message to Our Users* (April 1, 2020), https://blog.zoom.us/wordpress/2020/04/01/a-message-to-our-users/

[26] Taylor Lorenz and Davey Alba, *'Zoombombing' Becomes a Dangerous Organized Effort* (April 3, 2020), https://www.nytimes.com/2020/04/03/technology/zoom-harassment-abuse-racism-fbi-warning.html.

[27] *Id.*

---

4Chan where thousands of people had gathered to organize Zoom harassment campaigns, sharing meeting passwords and plans for sowing chaos in public and private meetings."[28]

49.    As early as March 20, 2020, Zoom admitted its product had an issue with Zoombombing.[29] Rather than change security protocols and default features, however, Zoom turned its back on its users asserting it was their inability to properly use the program.

50.    Nevertheless, incidents of Zoombombing continued to be reported. In one disturbing instance in the Berkley Unified School District a man joined a class meeting on Zoom, exposed himself to students, and shouted obscenities.  This led the Berkley Unified School District to suspend use of Zoom.[30]

51.    Additionally, at least one school district in San Diego County, and the New York City School District (this country's largest) have ordered their teachers to cease using Zoom.[31]

52.    Given these most recent incidents happening at our nation's schools, Zoom's representations that it "takes its users' privacy extremely seriously" and that its "customers' privacy is incredibly important to" it cannot be taken at face value. To date Zoom has marketed itself to institutions, and the pubic, under the false premise that its Zoom meetings are secure. Logically following from that is that Zoom participants would not be subjected to racial slurs and other abusive behavior.

53.    Had Zoom informed its users that it would not engage in a thorough review of its security protocols, or that it would create default settings or other security holes that

[28] *Id.*

[29] *How to Keep Uninvited Guests Out of Your Zoom Event* (March 20, 2020), https://blog.zoom.us/wordpress/2020/03/20/keep-uninvited-guests-out-of-your-zoom-event/.

[30] Kate Finman, *Berkeley school district temporarily suspends use of video conferencing after man 'Zoom bombs' class meeting* (April 8, 2020), https://www.dailycal.org/2020/04/08.

[31] Kristen Taketa, *San Diego Zoombombing' incident highlights need for schools to use safety controls* (April 8, 2020), https://www.sandiegouniontribune.com/news/education/story/2020-04-08/san-diego-zoombombing-incident-highlights-need-for-schools-to-use-safety-controls; Lauren Camera, *New York City Tells Teachers to Stop Using Zoom for Distance Learning* (April 7, 2020), https://www.usnews.com/news/education-news/articles/2020-04-07/new-york-city-tells-teachers-to-stop-using-zoom-for-distance-learning.

could be exploited by malicious actors, customers-like Plaintiffs and Class members-would not have been willing to purchase its services at the price charged, or even to have used it regardless of price.

54.     Zoom's failure to implement adequate security protocols jeopardized millions of consumers' privacy, fell well short of its promises, and diminished the value of the products and services provided. In other words, because Defendant failed to disclose its gross security inadequacies, and exposed users to malicious third parties' harassment, without their informed consent, it delivered fundamentally less useful and less valuable products and services than those for which consumers like Plaintiffs paid, and/or expected when they chose to use them

55.     While Zoom's wrongful conduct constitutes invasion of privacy in and of itself, entitling consumers to damages, Plaintiffs and Class members are also now placed at an increased risk of further imminent harm as a direct result of Zoom's wrongful acts and omissions.

## **Zoom Accounts on the Dark Web**

56.     On April 13, 2020, the technical news site BleepingComputer.com reported that account information belonging to over half a million Zoom users was published, exchanged and, in some cases, sold online without their knowledge or consent.[32]

57.     According to the report from, the breach was first identified by Cyble, a cybersecurity firm that discovered the issue and then later purchased approximately 530,000 stolen Zoom credentials in order to alert their clients.[33] The hacker forum was selling the credentials for .002 cents each. Cyble confirmed that a large portion of the credentials acquired were accurate through discussions with its clients.

---

[32] Lawrence Abrams, *Over 500,000 Zoom accounts sold on hacker forums, the dark web* (April 13, 2020), https://www.bleepingcomputer.com/news/security/over-500-000-zoom-accounts-sold-on-hacker-forums-the-dark-web/

[33] *Id.*

58. This instance of Zoom users' account information is yet another example that Zoom's failure to implement adequate security protocols or app review procedures jeopardized millions of consumers' privacy, fell well short of its promises, and diminished the value of the products and services provided. In other words, because Defendant failed to disclose its gross security inadequacies, and shared users' information with third parties without their informed consent, it delivered fundamentally less useful and less valuable products and services than those for which consumers like Plaintiffs paid, and/or expected when they chose to use them.[34]

59. While Zoom's wrongful conduct constitutes invasion of privacy in and of itself, entitling consumers to damages, Plaintiffs and Class members are also now placed at an increased risk of further imminent harm as a direct result of Zoom's wrongful acts and omissions.

## THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT RULE

60. Congress enacted the Children's Online Privacy and Protection Rule ("COPPA") in 1998 to protect the safety and privacy of children online by prohibiting the unauthorized or unnecessary collection of children's personal information online by operators of Internet Web sites and online services. COPPA directed the Federal Trade Commission to promulgate a rule implementing COPPA, 16 C.F.R. Part 312 ("COPPA Rule").

61. The COPPA Rule applies to any operator of a commercial Web site or online service directed to children that collects, uses, and/or discloses personal information from children, or on whose behalf such information is collected or maintained, and to any operator of a commercial website or online service that has actual knowledge that it collects,

---

[34] Zoom has admitted to further security issues related to its products including: "Zoombombing"— incidents of harassment by unauthorized participants in a Zoom meeting; failure of Zoom to implement promised end-to-end encryption; privacy issues related to attendee tracking features; data disclosures to LinkedIn; etc.

Eric S. Yuan, *A Message to Our Users* (April 1, 2020), https://blog.zoom.us/wordpress/2020/04/01/a-message-to-our-users/

uses, and/or discloses personal information from children. Defendant Zoom specifically advertises its video conferencing service to schools and children.

62. The COPPA Rule defines "personal information" to include, among other things, a first and last name; a home or other physical address including street name and name of a city or town; online contact information (i.e., an email address or other substantially similar identifier that permits direct contact with a person online, such as an instant messaging user identifiers, screen name, or user name); a persistent identifier such as an IP address that can be used to recognize a user over time and across different Web sites or online services; a photograph, video, or audio file where such file contains a child's image or voice; or information concerning the child or parents of that child that the operator collects online from the child and combines with an identifier described in this definition. Through its video conferencing services, Defendant collected personal information as defined in the COPPA Rule, including child names, addresses, IP addresses, and photographs and audio files containing a child's image or voice. Defendant also collected information from the child concerning the child that was combined with other identifiers, such as the name or photograph of the child.

63. Because Defendant collects and maintains personal information from its users through its video conferencing services, Defendant is an operator as defined by the COPPA Rule, 16 C.F.R. § 312.2.

64. Among other things, the Rule requires that an operator of a child-directed website or online service meet specific requirements prior to collecting online, using, or disclosing personal information from children, including but not limited to:

    a. posting a privacy policy on its website or online service providing clear, understandable, and complete notice of its information practices, including what information it collects from children, how it uses such information, and its disclosure practices for such information, and other specific disclosures set forth in the Rule;

    b. providing clear, understandable, and complete notice of its information practices, including specific disclosures, directly to parents;

c. obtaining verifiable parental consent prior to collecting, using, and/or disclosing personal information from children; and

d. establishing and maintaining reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children.

65. Defendant has failed to comply with each of these requirements as outlined in the failures and events described above, including but not limited to, Defendant's failure to properly post its privacy policy, failing to properly provide its information practices, failing to properly obtain parental consent, and failing to establish and maintain reasonable practices to protect personal information and prevent unauthorized access to video conferences.

## CHOICE OF LAW

66. The State of California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of all California residents and citizens of the United States against a company headquartered and doing business in California. California has a greater interest in the nationwide claims of Plaintiffs and members of the Nationwide Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

67. The corporate headquarters of Defendant, located in San Jose, California, is the "nerve center" of its business activities – the place where its officers direct, control, and coordinate the company's activities, including its data security functions and policy, financial, and legal decisions.

68. Defendant's Privacy Policy at issue here, and corporate decisions surrounding such policy, were made from and in California.

69. Defendant's breaches of duty to Plaintiffs and Nationwide Class members emanated from California.

70. Application of California law to the Nationwide Class with respect to Plaintiffs' and Class members' claims is neither arbitrary nor fundamentally unfair because California

has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Nationwide Class.

71. Under California's choice of law principles, which are applicable to this action, the common law of California applies to the nationwide common law claims of all Nationwide Class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's Unfair Competition Law and Confidentiality of Medical Information Act may be applied to non-resident plaintiffs as against this resident defendant.

## CLASS ALLEGATIONS

72. Plaintiffs bring this class action lawsuit individually and on behalf of the proposed Class members under Rule 23 of the Federal Rules of Civil Procedure.

73. Plaintiffs seek certification of a Nationwide Class, a California Sub-Class, and an Under 13 Sub-Class defined as follows:

> Nationwide Class: All persons in the United States whose personal data was collected and provided to third-parties by Zoom.

74. In the alternative, Plaintiffs seek certification of the following California state class:

> California Sub-Class: All persons in the State of California whose personal data was collected and provided to third-parties by Zoom.

75. Also in the alternative, Plaintiffs seek certification of the following nationwide class of children under the age of 13:

> Under 13 Sub-Class: All persons in the United States whose personal data was collected from them while they were under the age of 13 and provided to third-parties by Zoom.

76. Specifically excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

77. The Classes meet the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) for all of the following reasons.

78. **Numerosity:** Although the exact number of Class members is uncertain, and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable, believed to amount to many thousands of persons. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and the Court. Information concerning the exact size of the putative class is within the possession of Defendant. The parties will be able to identify each member of the Classes after Defendant's document production and/or related discovery.

79. **Commonality:** Common questions of law and fact exist and predominate over any questions affecting only individual Class members. The common questions include:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant collected Plaintiffs' and Class members' personal data;

c. Whether Defendant provided Plaintiffs' personal data to third-parties;

d. Whether Defendant adequately disclosed its policy of providing personal data to third-parties;

e. Whether Defendant's collection and storage of Plaintiffs' and Class and members' personal data in the manner alleged violated federal, state and local laws, or industry standards;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by providing personal data to third-parties;

g. Whether Defendant violated the consumer protection and privacy statutes applicable to Plaintiffs and members of the Class;

h. Whether Defendant acted negligently in failing to properly safeguard Plaintiffs' and Class members' personal data;

i. Whether Defendant's acts and practices complained of herein amounts to egregious breaches of social norms; and

j.    The nature of the relief, including equitable relief, to which Plaintiffs and Class members are entitled.

80.    **Typicality:** Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs and other Class members were injured through Defendant's uniform misconduct and their legal claims arise from the same core practices of Defendant.

81.    **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and there are no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

82.    **Risks:** The proposed action meets the requirements of Fed. R. Civ. P. 23 because prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendant or would be dispositive of the interests of members of the proposed Classes. Furthermore, Defendant's database still exists, and Defendant may still be intentionally or inadvertently providing data to third-parties – one standard of conduct is needed to ensure the future handling of Defendant's database.

83.    **Injunctive Relief:** The proposed action meets the requirements of Fed. R. Civ. P. 23(b)(2) because Defendant has acted or has refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Classes as a whole.

84.    **Predominance:** The proposed action meets the requirements of Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions that may affect only individual Class members in the proposed Classes.

85.    **Superiority:** The proposed action also meets the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to all other available methods of fairly and

efficiently adjudicating this dispute. The injury sustained by each Class member, while meaningful on an individual basis, is not of such magnitude that it is economically feasible to prosecute individual actions against Defendant. Even if it were economically feasible, requiring thousands of injured plaintiffs to file individual suits would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. Plaintiffs anticipate no unusual difficulties in managing this class action.

86. **Certification of Particular Issues:** In the alternative, this action may be maintained as class action with respect to particular issues in accordance with Fed. R. Civ. P. 23(c)(4).

87. Finally, all members of the purposed Classes are readily ascertainable. Defendant has access to addresses and other contact information for members of the Classes, which can be used to identify Class members.

**FIRST CAUSE OF ACTION**
**Invasion of Privacy and Violation of the California Constitution, Art. 1, § 1**
**(*On Behalf of Plaintiffs and all Classes*)**

88. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

89. Plaintiffs and Class members have a legally protected privacy interest in their private and personal information that is transferred to or recorded by Zoom, and are entitled to the protection of their property and information against unauthorized access.

90. Plaintiffs and Class members reasonably expected that their personal data would be protected and secure from unauthorized parties, and that their private and personal information would not be disclosed to any unauthorized parties or disclosed for any improper purpose.

91. Defendant unlawfully invaded the privacy rights of Plaintiffs and Class members by (a) failing to adequately secure their private and personal information from disclosure to unauthorized parties for improper purposes; (b) disclosing their private, and

personal information to unauthorized parties in a manner that is highly offensive to a reasonable person; and (c) disclosing their private and personal information to unauthorized parties without the informed and clear consent of Plaintiffs and Class members. This invasion into the privacy interest of Plaintiffs and Class members is serious and substantial.

92. In failing to adequately secure Plaintiffs' and Class members' personal information, Defendant acted in reckless disregard of their privacy rights. Defendant knew or should have known that its substandard security measures are highly offensive to a reasonable person in the same position as Plaintiffs and Class members.

93. Defendant violated Plaintiffs' and Class members' right to privacy under California law, including, but not limited to, Article 1, Section 1 of the California Constitution and the California Consumer Privacy Act.

94. As a direct and proximate result of Defendant's unlawful invasions of privacy, Plaintiffs' and Class members' private, personal, and confidential information has been accessed or is at imminent risk of being accessed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiffs and proposed Class members have suffered injuries as a result of Defendant's unlawful invasions of privacy and are entitled to appropriate relief.

95. Plaintiffs and Class members are entitled to injunctive relief as well as actual and punitive damages.

## SECOND CAUSE OF ACTION
### Negligence
#### (*On Behalf of Plaintiffs and all Classes*)

96. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

97. Defendant marketed and offered Zoom meetings to Plaintiffs and Class members with full awareness of the purposes for which Zoom meetings were being used, as well as the highly sensitive nature of the information Zoom meetings were allowed to access.

98. Defendant owed a duty to Plaintiffs and Class members arising from the sensitivity of Plaintiffs' and Class members' information and privacy rights Zoom meetings were supposed to secure and protect, to exercise reasonable care in safeguarding such information and privacy rights. This duty included, among other things, designing, maintaining, implementing, monitoring, testing, and complying with reliable security systems, protocols, and practices to ensure that Plaintiffs' and Class members' Zoom meetings were adequately secured from unauthorized access, and not disclosing their private and personal information to unauthorized parties without the informed and clear consent.

99. Defendant breached its duties by, among other things, (1) failing to implement and maintain reasonable security protections and protocols, and (2) knowingly sharing and/or selling customers' personal data to third parties for analytics and marketing purposes without adequate disclosure to and consent from its customers.

100. But for Defendant's breaches of its duties, Plaintiffs' and Class members' Zoom meetings would be protected from unauthorized access, and Plaintiffs' and Class members' homes, private and personal information, and privacy rights would not have been compromised and/or obtained by third parties without consent.

101. Plaintiffs and Class members were foreseeable victims of Defendant's wrongful conduct complained of herein. Defendant knew or should have known that its failure to implement reasonable protocols to adequately secure its customers' Zoom meetings and restrict third-party access to customers' personal data would cause damages to Plaintiffs and Class members.

102. As a result of Defendant's negligent and/or willful failures, Plaintiffs and Class members suffered injury, which includes but is not limited to exposure to a heightened, imminent risk of unauthorized access to their private and personal data, fraud, theft, and other financial harm. Plaintiffs and Class members must now more closely protect their private and personal data. Plaintiffs and Class members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining additional

protective measures to prevent unauthorized access to their private and personal data. The unauthorized access to Plaintiffs' and Class members' private and personal data also has diminished the value of that information.

103. The damages to Plaintiffs and Class members were a proximate, reasonably foreseeable result of Defendant's breaches of its duties.

104. Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
(***On Behalf of Plaintiffs and all Classes***)

105. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

106. Zoom is in the business of designing, creating, marketing, advertising, warranting, and selling Zoom meeting software. Defendant impliedly warranted to Plaintiffs and Class members that Zoom meeting software was of certain quality, free from defects, fit for the ordinary purpose of securing information and maintaining the safety of its customers.

107. Zoom meeting software is unfit for ordinary use and not of merchantable quality as warranted by Defendant because Zoom meeting software is not secure and can (and have been) easily be accessed by unauthorized third parties.

108. Prior to installation, Plaintiffs and Class members could not have readily discovered that Zoom meeting software was not merchantable for use to secure and protect Plaintiffs' and Class members' private and personal information.

109. Defendant has continually failed to provide adequate remedies under this implied warranty. Defendant's continuous failure to do so has caused this implied warranty to fail of its essential purpose, thereby permitting remedies under this implied warranty.

110. Defendant had unequal bargaining power and misrepresented Zoom meeting software's reliability and performance properties, and the limited remedies unreasonably favor Defendant and fail Plaintiffs' reasonable expectations of Zoom meeting software's performance.

111.   As a result of Defendant's breaches of this implied warranty, Plaintiffs and Class members suffered damages, injuries in fact and ascertainable losses.

112.   Accordingly, Plaintiffs, on behalf of themselves and members of the Class, seek an order declaring that Defendant's conduct constituted breaches of the implied warranty of merchantability, and awarding them damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Breach of Implied Contract**
**(*On Behalf of Plaintiffs and all Classes*)**

113.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

114.   Defendant provided Zoom meetings to Plaintiffs and members of the Class. In exchange, Defendant received benefits in the form of monetary payments and/or other valuable consideration, e.g. access to their private and personal data.

115.   Defendant has acknowledged these benefits and accepted or retained them.

116.   In using Zoom meetings, Plaintiffs and Class members continually provide Defendant with their private and personal information.

117.   By providing that information, and upon Defendant's acceptance of that information, Plaintiffs and Class members, on the one hand, and Defendant, on the other, entered into implied contracts whereby Defendant agreed to and was obligated to take reasonable steps to secure and safeguard that sensitive information. Such safeguarding was integral and essential to Defendant's entire line of business, secure video conferencing services.

118.   Under those implied contracts, Defendant was obligated to provide Plaintiffs and Class members with Zoom meetings that were suitable for their intended purpose of providing secure video conferencing services, rather than other video conferencing services vulnerable to unauthorized access, incapable of providing safety and security, and instead actually utilized to track its users' personal data for commercial purposes.

119. Without such implied contracts, Plaintiffs and Class members would not have used Zoom meetings and would not have conferred benefits on Defendant, but rather chosen alternative video conferencing services that did not present these privacy and safety risks.

120. Plaintiffs and Class members fully performed their obligations under these implied contracts.

121. As described throughout, Defendant did not take reasonable steps to safeguard Plaintiffs' and Class members' private information. In fact, Defendant willfully violated those privacy interests by tracking and disclosing its customers' personal data to third parties without consent.

122. Because Defendant failed to take reasonable steps to safeguard Plaintiffs' private information, Defendant breached its implied contracts with Plaintiffs and Class members.

123. Defendant's failure to fulfill its obligation to safeguard Plaintiffs' and Class members' private information resulted in Plaintiffs and Class members receiving video conferencing services that were of less value than they provided consideration for (*i.e.*, unsecure video conferencing services without adequate security).

124. Stated otherwise, because Plaintiffs and Class members provided valuable consideration for secure video conferences and privacy protections they did not receive—even though such protections were a material part, if not the very essence, of their contracts with Defendant—the full benefit of their bargain.

125. As a result of Defendant's conduct, Plaintiffs and members of the Class have suffered actual damages in an amount equal to the difference in the value of the video conferencing services they provided valuable consideration for and the unsecure video conferences they received.

126. Accordingly, Plaintiffs, on behalf of themselves and Class members, seeks an order declaring that Defendant's conduct constitutes breach of implied contract, and awarding them damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (*On Behalf of Plaintiffs and all Classes*)

127.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

128.    Defendant received a benefit from Plaintiffs and Class members in the form of payments and/or other valuable consideration, e.g. access to their private and personal data, for videoconferencing services.

129.    Those benefits received by Defendant were at the expense of Plaintiffs and Class members.

130.    The circumstances alleged herein are such that it would be unjust for Defendant to retain the portion (if not the entirety) of Plaintiffs' and Class members' payments, or the value of other consideration, that should have been earmarked to provide secure and reliable videoconferencing services, and adequate privacy and security procedures and safeguards for Plaintiffs' and the Class' private information, including only third-party sharing as authorized by its customers.

131.    Plaintiffs and the Class seek disgorgement of Defendant's ill-gotten gains.

## SIXTH CAUSE OF ACTION
### Violation of the California Unfair Competition Law,
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (*On Behalf of Plaintiffs and all Classes*)

132.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

133.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

134.    Defendant engaged in unfair, fraudulent, and unlawful business practices in connection with its provision of Zoom meetings, in violation of the UCL.

135.    As alleged herein, Defendant expressly represented to consumers such as Plaintiffs and Class members, among other things: that Zoom meetings were secure; and that Defendant would maintain adequate security practices and procedures to protect Plaintiffs' and Class members' private information from unauthorized access. Defendant

also omitted or concealed the material fact of its inadequate privacy and security measures, and failed to disclose to Plaintiffs and Class members that it failed to meet legal and industry standards for the protection of Zoom meetings and consequently, its customers' private property and information. Defendant also concealed its commercial tracking and sharing of customers' personal data with third parties.

136. The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

137. Defendant violated the "unlawful" prong of the UCL by violating, *inter alia*, Plaintiffs' and Class members' constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes, such as Article 1, Section 1 of the California Constitution, COPPA, and the CCPA.

138. Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged herein, offended public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class members. The harm caused by Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests, other than Defendant's conduct described herein.

139. By exposing, compromising, and willfully sharing and/or selling Plaintiffs' and Class members' private property and personal information without authorization, Defendant engaged in a fraudulent business practice that is likely to deceive a reasonable consumer.

140. A reasonable person would not have agreed to purchase Zoom meetings software and services had he or she known the truth about Defendant's practices alleged herein. By withholding material information about its practices, Defendant was able to convince customers to use Zoom meetings and to entrust their highly personal information to Defendant. Accordingly, Defendant's conduct also was "fraudulent" within the meaning of the UCL.

1    141.    As a result of Defendant's violations of the UCL, Plaintiffs and Class

2    members are entitled to injunctive relief.

3    142.    As a result of Defendant's violations of the UCL, Plaintiffs and Class

4    members have suffered injury in fact and lost money or property, as detailed above.

5    Plaintiffs request that the Court issue sufficient equitable relief to restore Plaintiffs and

6    Class members to the position they would have been in had Defendant not engaged in

7    unfair competition.

**SEVENTH CAUSE OF ACTION**
**Violation of the California Consumers Legal Remedies Act,**
**Cal. Civ. Code § 1750, *et seq.***
**(*On Behalf of Plaintiffs and all Classes*)**

11    143.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

12    144.    California's Consumers Legal Remedies Act ("CLRA") has adopted a

13    comprehensive statutory scheme prohibiting various deceptive practices in connection with

14    the conduct of a business providing goods, property, or services to consumers primarily for

15    personal, family, or household purposes. The self-declared purposes of the CLRA are to

16    protect consumers against unfair and deceptive business practices and to provide efficient

17    and economical procedures to secure such protection.

18    145.    Defendant is a "person" as defined by Civil Code Section 1761(c), because it

19    is a corporation, as set forth above.

20    146.    Plaintiffs and Class members are "consumers" within the meaning of Civil

21    Code Section 1761(d).

22    147.    Zoom meeting software purchased by Plaintiffs and the Class constitute

23    "goods" and within the meaning of Cal. Civ. Code § 1761(a).

24    148.    Zoom meeting services purchased by Plaintiffs and the Class constitute

25    "services" within the meaning of Cal. Civ. Code § 1761(b).

26    149.    Defendant's sale of Zoom meeting software to Plaintiffs and the Class

27    constitute "transactions," as defined by Cal. Civ. Code § 1761(e).

28

150.    Plaintiffs and Class members purchased Zoom meetings software and services from Defendant stores for personal, family, and household purposes, as defined by Cal. Civ. Code § 1761(d).

151.    Venue is proper under Cal. Civ. Code § 1780(d) because a substantial portion of the conduct at issue occurred in this District. An affidavit establishing that this Court is the proper venue for this action is attached below.

152.    As described herein, Defendant's practices constitute violations of California Civil Code Section 1770 in at least the following respects:

    a.    In violation of Section 1770(a)(5), Defendant misrepresented that Zoom meeting software and services had characteristics, benefits, or uses that they do not have (being private and secure from unauthorized third-party access when in fact they are not);

    b.    In violation of Section 1770(a)(7), Defendant misrepresented that Zoom meeting software and services were of a particular standard, quality, and/or grade when they were of another (being private and secure from unauthorized third-party access when in fact they are not);

    c.    In violation of Section 1770(a)(9), Defendant advertised Zoom meeting software and services with an intent not to sell them as advertised (advertising them as being private and secure from unauthorized third-party access when in fact they are not);

    d.    In violation of Section 1770(a)(16), Defendant misrepresented that Zoom meeting software and services were supplied in accordance with previous representations when they were not (that they are private and secure from unauthorized third-party access when in fact they are not).

153.    Defendant's misrepresentations regarding Zoom meeting software and services were material to Plaintiffs and Class members because a reasonable person would have considered them important in deciding whether or not to purchase Zoom meeting software and services.

154. Plaintiffs and Class members relied upon Defendant's material misrepresentations and would have acted differently had they known the truth.

155. As a direct and proximate result of Defendant's material misrepresentations, Plaintiffs and Class members have been irreparably harmed.

156. In accordance with Cal. Civ. Code § 1782(a), prior to the filing of this Complaint, Plaintiffs' counsel served Defendant with notice of these CLRA violations by certified mail, return receipt requested.

157. On behalf of Class members, Plaintiffs seek injunctive relief in the form of an order enjoining Defendant from making such material misrepresentations and to engage in a corrective advertising to alert consumers of these misrepresentations. If Defendant fails to respond to Plaintiffs' notice letter or agree to rectify the violations detailed above and give notice to all affected consumers within 30 days of the date of written notice, Plaintiffs also will seek actual, punitive, and statutory damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendant's CLRA violations.

## EIGHTH CAUSE OF ACTION
### Violation of the California Consumer Privacy Act,
### Cal. Civ. Code § 1798.100, *et seq.*
### (*On Behalf of Plaintiffs and all Classes*)

158. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

159. California's Consumer Privacy Act ("CCPA") recently was enacted to protect consumers' personal information from collection and use by businesses without appropriate notice and consent.

160. Through the above-detailed conduct, Defendant violated the CCPA by, *inter alia*, collecting and using personal information without providing consumers with notice consistent with the CCPA, in violation Civil Code § 1798.100(b), and failing to prevent Plaintiffs' and Class members' nonencrypted and nonredacted personal information from unauthorized disclosure as a result of Defendant's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, in violation of Civil Code § 1798.150(a).

161. In accordance with Cal. Civ. Code § 1798.150(b), prior to the filing of this Complaint, Plaintiffs' counsel served Defendant with notice of these CCPA violations by certified mail, return receipt requested.

162. On behalf of Class members, Plaintiffs seek injunctive relief in the form of an order enjoining Defendant from continuing to violate the CCPA. If Defendant fails to respond to Plaintiffs' notice letter or agree to rectify the violations detailed above within 30 days of the date of written notice, Plaintiffs also will seek actual, punitive, and statutory damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendant's CCPA violations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all Class members proposed in this Complaint, respectfully requests that the Court enter a judgment in his favor and against Defendant, as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and appointing and his Counsel to represent the Class;

B. Finding Defendant's conduct was unlawful as alleged herein;

C. Enjoining Defendant from engaging in the wrongful conduct complained of herein;

D. Requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. Awarding Plaintiffs and Class members actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined;

F. Awarding Plaintiffs and Class members costs of suit and attorneys' fees, as allowable by law; and

G. Granting such other and further relief as this court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demands a trial by jury on all issues so triable.

1
2
3      DATED: April 14, 2020

Respectfully submitted,

*/s/ Tina Wolfson*
Tina Wolfson
Theodore Maya
Bradley K. King
Christopher E. Stiner
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, CA  90024
Tel: (310) 474-9111;
Fax: (310) 474-8585

*Counsel for Plaintiffs*

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# AFFIDAVIT OF TINA WOLFSON

I, Tina Wolfson, declare as follows:

1.     I am an attorney with the law firm of Ahdoot & Wolfson, PC, counsel for Plaintiffs in this action. I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code section 1780(d). I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2.     Venue is proper in this Court because many of the acts and transactions giving rise to this action occurred in this District, and Defendant (1) is authorized and registered to conduct business in this District, (2) has intentionally availed itself of the laws and markets of this District through the distribution and sale of its merchandise in this District, and (3) is subject to personal jurisdiction in this District.

3.     Plaintiff M.F. is a resident of Culver City, California.

4.     Plaintiff Therese Jimenez is a resident of Culver City, California.

5.     Defendant Zoom Video Communications, Inc. is a Delaware corporation with its principal place of business at 55 Almaden Blvd, San Jose, California 95113. Defendant is registered and authorized to conduct business and regularly conducts business in the State of California.

I declare under penalty of perjury under the laws of the United States and the State of California this 14th day of April, 2020 in Los Angeles, California that the foregoing is true and correct.

  _/s/ Tina Wolfson_
Tina Wolfson